IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-03450-RBJ

JESSICA PECK,

     Plaintiff,

v.

BETH McCANN, in her official capacity as the District Attorney of the Second Judicial District, State of Colorado, and;
MICHELLE BARNES, in her official capacity as the Executive Director of the Colorado Department of Human Services,

     Defendants.

---

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

---

This case involves a constitutional challenge to a portion of the Colorado Children's Code Records and Information Act, Colo. Rev. Stat. §§ 19-1-301 *et seq.*, which prohibits disclosure of information contained in child abuse and neglect records and reports.  Before the Court are three motions for summary judgment filed by defendant Beth McCann [ECF No. 65], defendant Michelle Barnes [ECF No. 66], and plaintiff Jessica Peck [ECF No. 67].  For the reasons discussed below, the Court finds that the subsections in question, § 19-1-307(1)(c) and (4), fail strict scrutiny and are therefore unconstitutional.  Defendants' motions for summary judgment are thus DENIED, and plaintiff's motion for summary judgment is GRANTED.

## I. FACTUAL BACKGROUND

The parties submitted a Joint Statement of Stipulated Facts.  ECF No. 60.  All undisputed facts below are drawn from that document.  Facts drawn from any other source are noted as such.

### A.  <u>The parties</u>

Plaintiff Jessica Peck is an attorney licensed to practice law in the State of Colorado.  She advocates on behalf of parents in Colorado juvenile courts in matters governed by the Colorado Children's Code, Title 19 of the Colorado Revised Statutes.  ECF No. 60 at ¶¶4–5.

Defendant Beth McCann is the District Attorney for the Second Judicial District, which consists of the same geographic area of the City and County of Denver.  *Id.* at ¶7.  The District Attorney for the Second Judicial District is charged with enforcing the criminal laws of the State of Colorado for offenses committed within the City and County of Denver, by and through the prosecution of criminal charges alleging the violation of such laws.  *Id.* at ¶8.

Defendant Michelle Barnes is the Executive Director of the Colorado Department of Human Services ("the Department").  *Id.* at ¶9.  The Department supervises and provides policy direction for Colorado's child welfare system, which is administered by Colorado's sixty-four counties through local Departments of Human Services.  *Id.*

### B.  <u>Child welfare services in Colorado</u>

Child abuse is one of the most difficult crimes to protect against.  There are often no witnesses except the victim.  Children often feel guilt and vulnerability associated with their abuse.  These negative feelings are amplified when the abuser is a parent or loved one.  *Id.* at ¶52.  Children are generally more likely to report abuse when they are assured that their

2

identifying information will remain confidential and protected from public disclosure.  *Id.*

Disclosure of information that identifies an abused or neglected child may be detrimental to the

child, particularly if it discloses circumstances of the abuse or neglect.  *Id.* at ¶51.  Children and

their families who are subject to a child abuse or neglect investigation may experience stigma

when their confidential information—including that contained in records or reports of child

abuse or neglect—is disclosed in an identifying manner.  *Id.* at ¶53.

In Colorado, child welfare services include child protection, risk assessment, and case

management.  *Id.* at ¶9.  The Colorado Department of Human Services constitutes the highest-

level agency tasked with child welfare.  However, county-level caseworkers, including licensed

social workers, are the ones who investigate reports of child abuse or neglect and recommend

and initiate responses to the reports.  Those responses include offering voluntary services to a

family; coordinating safety planning with relatives and other support networks to keep a child in

his or her home; and initiating dependency and neglect proceedings in juvenile court when a

child cannot safely remain at home, and when safety concerns cannot be mitigated.  *Id.* at ¶10.

In a dependency and neglect proceeding, the juvenile court may order a change of custody,

removal of a child from the parental home, or both.  *Id.*

The Department promulgates regulations to effectuate its functions and responsibilities,

including with respect to child welfare referral and assessment.  Child welfare regulations are

codified in the Colorado Code of Regulations, 12 Code Colo. Regs. 2509-7, also known as

"Volume 7."  *Id.* at ¶31.  As part of these regulations, the Colorado Department of Human

Services created an electronically stored case management system for keeping records and

reports pursuant to Colo. Rev. Stat. § 19-3-313.5.  *Id.* at ¶32.  County caseworkers routinely

document their investigations, interactions with, and observations of children and members of their family or families involved. *Id.* at ¶11. County caseworkers may submit reports summarizing their investigations to courts in the system of child protection under the Colorado Children's Code. *Id.* at ¶12.

If an individual has concerns about an investigation into a report of child abuse or neglect, e.g. regarding the conduct of a caseworker or licensed social worker, there are numerous ways that individual can voice his or her concern. For example, the state has a Child Protection Ombudsman. *Id.* at ¶22. The Child Protection Ombudsman is independent from state and county agencies that investigate cases of suspected child abuse or neglect, including the Colorado Department of Human Services and Denver Human Services. *Id.* at ¶24. Members of the public may submit a complaint to the ombudsperson online through a form. The website also includes the office's physical address and other contact information. *Id.*

Concerns regarding child welfare activities may also be raised with Denver Human Services. Individuals may use online forms, the main telephone number, or they may contact current or former caseworkers. *Id.* at ¶21. All complaints and grievances are directed to a Denver Human Services employee for review, investigation, and response. Individuals who submit their complaint or grievance through a certain form are informed that they may also submit their concern to the Federal Office of Civil Rights or the Colorado Department of Human Services. *Id.* If an individual is not satisfied with Denver Human Services' response to his or her complaint or grievance, the individual may request further review by the Human Services Citizen Review Panel. *See* Denver Rev. Mun. Code §§ 2-253 to 2-255.7. However, this process has not been utilized in recent years because members of the public have instead chosen to file

complaints with the Child Protection Ombudsman of Colorado.  ECF No. 60 at ¶21.

Additionally, the Colorado Department of Human Services has an Institutional Abuse Review Team ("IART").  *Id.* at ¶25.  The IART is a citizen review panel that reviews institutional assessments done by counties.  Its work is authorized under Colo. Rev. Stat. § 19-3-308(4.5)(a).  It determines whether a county has conducted a thorough assessment of an institution, provides technical assistance and coaching to facilities and county staff, gives feedback to the counties through the child welfare case management system, and provides the county that completed the assessment with guidance on the missing information.  *Id.*

A member of the public may also file a complaint with the State of Colorado's Department of Regulatory Agencies ("DORA") regarding the conduct of a licensed or clinical social worker, including those employed as county caseworkers.  *Id.* at ¶26.  DORA regulates and provides oversight of licensed and clinical social workers with the assistance of the Colorado State Board of Social Work Examiners.  Complaints may be filed via DORA's online form.  *Id.* Finally, an individual can submit a general complaint to the City and County of Denver by dialing 3-1-1 or by submitting an online form.  Complaints or inquiries related to Human Services will be forwarded to that department for response.  *Id.* at ¶20.

### C.  **CAPTA and the Colorado Children's Code**

The Child Abuse Prevention and Treatment Act ("CAPTA"), found at 42 U.S.C. §§ 5101-5116i, is a federal statute that provides funding and guidance to states on child abuse and neglect.  States receive grants for child abuse prevention, assessment, investigation, and treatment activities through CAPTA.  *Id.* at § 5116(a)-(b).  To qualify for a CAPTA grant, a state must submit a state plan that includes a certification by its Governor.  Each state must certify,

among other things, that

> [T]he State has in effect and is enforcing a State law, or has in effect and is operating a statewide program, relating to child abuse and neglect that includes . . . methods to preserve the confidentiality of all records in order to protect the rights of the child and the child's parents or guardian, including requirements ensuring that reports and records made and maintained pursuant to the purposes of this [Act] shall only be made available to [specified persons, entities, and agencies].

42 U.S.C. § 5106a(b)(2)(B)(viii).

CAPTA explicitly allows for disclosure of child abuse records to the following: individuals who are the subject of the report; federal, state, or local government entities, or any agent of such entities that needs the information in order to carry out its legal responsibilities to protect children from child abuse and neglect; child abuse citizen review panels; child fatality review panels; a grand jury or court, upon a finding that information in the record is necessary for the determination of an issue before the court or grand jury; and other entities or individuals authorized by the state pursuant to a legitimate state purpose. 42 U.S.C. § 5106a(b)(2)(B)(viii).

The Colorado Children's Code Records and Information Act, Colo. Rev. Stat. §§ 19-1-301 through 19-1-311 ("Children's Code"), was enacted by the General Assembly in 1975 in an effort to "balance the best interests of children and the privacy interests of children and their families with the need to share information among service agencies and schools and the need to protect the safety of schools and the public at large." Colo. Rev. Stat. § 19-1-302. The Children's Code represents part of Colorado's compliance with CAPTA provisions in order to receive federal funding. ECF No. 60 at ¶27.

Generally speaking, the Children's Code permits judicial departments, agencies, and attorneys for both the agencies and individuals in delinquency or dependency and neglect proceedings to exchange information in order to conduct oversight, refer services and support,

investigate cases, and conduct case management.  Colo. Rev. Stat. § 19-1-303(1)(a)-(b).  As required by CAPTA, however, the Children's Code also protects and limits the use of child abuse and neglect reports and the information contained therein.  The provision that meets this requirement in Colorado is § 19-1-307.  The purposes of CAPTA and this corresponding provision in the Colorado Children's Code are to secure the privacy rights of children and families, and to protect them from stigma or other negative effects they may face by disclosure of their confidential information.  *Id.* at ¶28, 54.  The Colorado Department of Human Services has renewed certification of § 19-1-307 annually in order to ensure that Colorado receives ongoing CAPTA grant funding from the federal government.  *Id.* at ¶29.

Colo. Rev. Stat. § 19-1-307(1)(a) states "[e]xcept as otherwise provided in this section and section 19-1-303, reports of child abuse or neglect and the name and address of any child, family, or informant or any other identifying information contained in such reports shall be confidential and shall not be public information."  The confidentiality provision goes on in § 19-1-307(1)(b) to read

> Disclosure of the name and address of the child and family and other identifying information involved in such reports shall be permitted only when authorized by a court for good cause.  Such disclosure shall not be prohibited when there is a death of a suspected victim of child abuse or neglect and the death becomes a matter of public record or the alleged juvenile offender is or was a victim of abuse or neglect or the suspected or alleged perpetrator becomes the subject of an arrest by a law enforcement agency or the subject of the filing of a formal charge by a law enforcement agency.

There are two criminal sub-provisions in § 19-1-307—one petty offense and one misdemeanor.  The first, § 19-1-307(1)(c), states "[a]ny person who violates any provision of this subsection (1) is guilty of a class 2 petty offense and, upon conviction thereof, shall be punished by a fine of not more than three hundred dollars."  The second, § 19-1-307(4), provides

> Any person who improperly releases or who willfully permits or encourages the release of data or information contained in the records and reports of child abuse or neglect to persons not permitted access to such information by this section or by section 19-1-303 commits a class 1 misdemeanor and shall be punished as provided in section 18-1.3-501, C.R.S. [imposing minimum six months' imprisonment or five hundred dollar fine].

There are many exceptions to the non-disclosure rule of § 19-1-307.  The following are among the entities or individuals who may access and use reports or records of child abuse or neglect without violating the statute: government officials investigating reports of child abuse or neglect, such as law enforcement, district attorneys, and coroners; physicians treating children who suspect abuse or neglect; agencies or people responsible for children's welfare, such as a parent or guardian; individuals named in reports as having been allegedly abused or neglected; mandatory reporters of child abuse or neglect such as mental health professionals, physicians, dentists, school employees, and clergy members; members of a child protection team created under § 19-3-308(6)(a); the child protection ombudsman program; state and county departments of human or social services for screening employees, prospective adoptive parents, and others; county attorneys, guardians ad litem and counsel for parents in child care proceedings (with certain restrictions); and "[s]uch other persons as a court may determine, for good cause." Colo. Rev. Stat. § 19-1-307(2).  To be clear, however, the entities and persons covered by these exceptions are not permitted to disclose the contents of records or reports to anyone they wish, such as the media—they are simple among those who may access records or reports, i.e. *to whom* disclosure is allowed.  A court may also grant permission "for good cause" to disclose information prohibited by the statute.  *Id.* § 19-1-307(1)(b).

The Children's Code also includes § 19-3-308(6),  which provides for the creation of child protection teams in subsection (a).  The subsequent section (b) states that "if a child

protection team is established pursuant to subsection (6)(a) of this section, it may review an assessment or the investigatory reports of a case, including the diagnostic, prognostic, and treatment services being offered to the family in connection with the reported abuse." *Id.* § 19-3-308(6)(b).  In addition, as part of their duties child protection teams

> [S]hall publicly review the responses of public and private agencies to each reported incident of child abuse or neglect, publicly state whether the responses were timely, adequate, and in compliance with the provisions of this part 3, and publicly report nonidentifying information relating to any inadequate responses, specifically indicating the public and private agencies involved. . . . After this mandatory public discussion of agency responses, a child protection team established pursuant to subsection (6)(a) of this section shall go into executive session upon the vote of a majority of the child protection team members to consider identifying details of the case being discussed; discuss confidential reports, including but not limited to the reports of physicians, including psychiatrists; or, when the members of the child protection team desire, act as an advisory body concerning the details of treatment or evaluation programs.

*Id.* § 19-3-308(f)-(g).

### D.  <u>Ms. Peck's actions leading to this lawsuit</u>

In January of 2019 Ms. Peck represented the mother of a three-year-old girl in a dependency and neglect case in Denver Juvenile Court.  *Id.* at ¶33.  In the course of that representation Ms. Peck made statements to the Denver weekly newspaper, Westword.  She opined that Denver Human Services brought the case against her client because she supported her ex-husband, John Affourtit, who was also the child's father.  *Id.* at ¶34.  Mr. Affourtit was accused of abusing and murdering another child, the three-year-old son of his then-girlfriend, while Ms. Peck's client's daughter was also in his care.  Ms. Peck provided Westword with a portion of an e-mail from a caseworker supervisor detailing some of Denver Human Services' concerns.  Ms. Peck also provided Westword with the date, time, and courthouse location of an upcoming hearing in the case.  *Id.*

Specifically, the Westword quoted Ms. Peck as saying, "[i]t's stunning to me that DHS would file a case against somebody without a single shred of evidence, based on one family member standing up for another family member in advance of trial when the accused is still in jail." ECF No. 24-2 at 3.  It also quoted her stating "[i]t's hard to imagine that is somehow endangerment or failing to protect a child.  I've never seen anything like this, ever." *Id.*  The article said Peck noted that Denver Human Services ("DHS") "targeted" her client.  She said they "threatened" a dependency and neglect proceeding and defined those proceedings.  *Id.* at 5.  Westword also wrote that Ms. Peck believed DHS never witnessed a phone call alleged to be the basis for their investigation into her client.  *Id.*  Finally, the article quoted her as saying: "[m]y concern is the broader question of what happens to people who stand up for family members," and "[i]s DHS really going to be in the business of confiscating children before the accused goes on trial when that child is otherwise in no immediate physical danger?"  *Id.* at 7.

After the article was published, the presiding Juvenile Court Magistrate issued an order in the dependency and neglect case.  ECF No. 60 at ¶35.  The order read

> The Court has become aware that Counsel for Respondent Mother . . . may have disclosed confidential identifying information to a non-party in violation of § 19-1-307(1)(a), C.R.S.  Disclosure of identifying information in a dependency or neglect proceeding is a criminal offense pursuant to § 19-1-307(1)(b), C.R.S. . . . This Order will serve as notice to all parties that any identifying information pertaining to this dependency and neglect proceeding shall be kept confidential in accordance with § 19-1-307(1)(a) and § 19-1-303.

ECF No. 24-3.  The juvenile court took no further action against Ms. Peck for her violation of Colo. Rev. Stat. § 19-1-307.  ECF No. 60 at ¶36.

Ms. Peck has not been threatened with prosecution of a criminal offense under Colo. Rev. Stat. § 19-1-307 by a district attorney or other prosecuting attorney who could charge or

prosecute a criminal case.  *Id.* at ¶39.  Neither the Denver Police Department nor any other law enforcement agency has contacted Ms. Peck about an alleged violation under the statute, nor is she aware of any investigation concerning her alleged violation.  *Id.* at ¶¶ 46–47, 49.  Nor has the City of Denver threatened to prosecute her under § 19-1-307(1).  *Id.* at ¶44.  Ms. Peck is also not aware of any action that Executive Director Barnes has taken to seek enforcement of § 19-1-307 against herself or anyone else.  *Id.* at ¶50.  Neither defendant McCann nor anyone from her office has had any contact with Ms. Peck.  *Id.* at ¶42.

A search of District Attorney McCann's office records, which go back to 1966, revealed that no person has ever been investigated or prosecuted for an alleged violation under § 19-1-307.  *Id.* at ¶40.  To defendant McCann's knowledge, no such matter has ever been referred to her office by any law enforcement authority or any judicial officer.  *Id.* at ¶41.  A search of the Denver City Attorney office's database for Prosecution and Code Enforcement Section, which goes back to 2010, likewise showed that no person had been prosecuted under § 19-1-307(1).  *Id.* at ¶48.

District Attorney McCann's office has no written or unwritten policies, customs, or practices concerning the enforcement or non-enforcement of the Children's Code § 19-1-307(4).  *Id.* at ¶44.  Denver has no policy, custom, or practices of prosecuting concerning enforcement or non-enforcement of Children's Code § 19-1-307(1).  *Id.* at ¶45.

Ms. Peck desires in the future to make public statements, including through the press, calling out public officials and public employees when they have issued materially false or

improper reports about her clients.  ECF No. 55 at ¶11.[1]  She believes that § 19-1-307 prohibits her public criticism of government officials to the extent it cites, quotes, repeats, or paraphrases information contained in a child abuse report or record.  *Id.* at ¶20.  She also believes that basing her comments on the content of such reports or records "is essential to the credibility of any criticism [she] would voice to the public or the press," and thus she believes her speech has been and remains chilled and abridged.  *Id.*

Ms. Peck has never reported a concern, complaint, or grievance regarding Colorado or Denver's child welfare system, or specifically the conduct of any caseworker, to the agencies and entities mentioned in Section I.B. above (Child Protection Ombudsman, the IART, Denver Department of Human Services, Colorado Department of Human Services, or DORA).  ECF No. 60 at ¶37.  Nor has she reported to any city council or Board of County Commissioners.  *Id.*  In her declaration, Ms. Peck stated that she believes formal complaints to public agencies are "delayed processes" and "ineffectual in comparison to the beneficial effects of contemporaneous public scrutiny of questionable official conduct."  ECF No. 55 at ¶23.

## II. PROCEDURAL BACKGROUND

Plaintiff Ms. Peck filed this action on December 9, 2019 against various Colorado government entities and government officials in their official capacities.  ECF No. 1.  She submitted an amended complaint on January 29, 2020.  ECF No. 24.  In it she seeks a declaration that Colo. Rev. Stat. § 19-1-307(1) and (4) fail strict scrutiny, and that they are unconstitutionally overbroad and vague on their face.  She also asks this Court to enjoin enforcement of these

---

[1] This statement is not included in the parties' Joint Statement of Stipulated Facts [ECF No. 60].  However, there is nothing in the record to dispute it, as it represents plaintiff's belief, and I thus consider it for purposes of this motion.

criminal provisions. *Id.* By the time the parties filed their motions for summary judgment, the two defendants remaining were Ms. Michelle Barnes and Ms. Beth McCann, both sued in their official capacities.

On July 6, 2020 the parties filed a joint stipulation of facts for the Court to use in ruling on summary judgment. ECF No. 60. Plaintiff Ms. Peck, defendant Ms. Barnes, and defendant Ms. McCann each filed a motion for summary judgment on August 19, 2020. ECF Nos. 65, 66, and 67. Ms. McCann responded on September 22, 2020, while Ms. Peck and Ms. Barnes responded the next day. ECF Nos. 68, 69, and 70. All parties filed their replies on October 14, 2020. ECF Nos. 71, 72, and 73. The three parties agreed that all issues in the case should be resolved by the Court on summary judgment. ECF No. 75. As a result, the Court vacated the jury trial and has taken the parties' respective motions and stipulated facts under advisement.

### III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court will examine the factual record and make reasonable

inferences in the light most favorable to the party opposing summary judgment.  *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

Where, as here, the parties file cross-motions for summary judgment, each motion is considered separately and "the denial of one does not require the grant of another."  *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  The court is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1339 (D. Colo. 2016), *aff'd*, 734 F. App'x 586 (10th Cir. 2018) (unpublished).  "[T]he reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party."  *Id.* (citing *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004)).

### IV. ANALYSIS

Ms. Peck raises three challenges to § 19-1-307.  First, she argues the statute violates her free speech.  ECF No. 24 at ¶¶42–44.  Second, she contends the statute is unconstitutionally overbroad.  *Id.* at ¶45.  Third, she claims it is impermissibly vague.  *Id.* at ¶¶47–49.  Before I address each of Ms. Peck's challenges, I must first consider the parties' disputes over the scope of § 19-1-307 and whether Ms. Peck has standing.

### A.  Scope of § 19-1-307 and its application to Ms. Peck

#### 1.  Scope of § 19-1-307

The parties dispute the scope of what information is prohibited from disclosure by § 19-1-307.  As a reminder, § 19-1-307(1) says that "reports of child abuse or neglect and the name and address of any child, family, or informant or any other identifying information contained in

14

such reports shall be confidential and shall not be public information." § 19-1-307(4) mentions "reports and records." The scope question is important because Ms. Peck has renounced any desire to disclose information that identifies children, family members, or informants such as names or addresses. ECF No. 67 at 20. Her interest is in disclosing *nonidentifying* information contained in child abuse and neglect reports or records to bolster claims that some child welfare caseworkers are doing their jobs poorly. If the statute does not prohibit the speech Ms. Peck wants to utter, then there is no controversy—the case ends there.

Plaintiff reads the language of § 19-1-307 to mean that *all* content contained within records or reports of child abuse or neglect is prohibited. Defendant McCann reads the statute more narrowly. She argues that if Peck were to make statements that do not identify any child, family member, or other non-official involved, "that does not appear to contravene the confidentiality provisions of Section 307." ECF No. 65 at 6. In other words, only disclosure of *identifying* information violates the statute. Defendant Barnes, on the other hand, appears to agree with plaintiff and concede that § 19-1-307 renders all content within child abuse or neglect reports confidential. She writes in her motion that § 19-1-307(1)(a)'s prohibition "protect[s] child abuse and neglect reports and identifying information," suggesting in her use of the conjunction "and" that identifying information is a separate category of non-disclosable content from the reports. ECF No. 66 at 21. Ms. Barnes tries to get around application of § 19-1-307 in her own way, however, by arguing that "[r]eports of abuse constitute identifying information because each instance of abuse or neglect is characterized by its own unique circumstances." *Id.* In essence, she believes that everything included in an abuse or neglect report is "identifying."

The Colorado legislature first enacted a prohibition on disclosing confidential

information related to child abuse and neglect reports in 1975.  It did so as part of the then-

named "Child Protection Act of 1975."  It read

> It is unlawful for any person or agency to solicit, encourage disclosure of, or disclose the contents of any record or report made under this article.  Any person who violates this section is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than five hundred dollars, or imprisoned in the county jail for not more than three months, or by both such fine and imprisonment.

Colo. Rev. Stat. § 19-10-115 (1975).

The Colorado Court of Appeals interpreted this language in *Gillies v. Schmidt*.  In that

case, plaintiff representatives of the Denver Post sought an injunction to prevent a child

protection team from holding meetings at which the press and public were excluded.  *Gillies v.

Schmidt*, 556 P.2d 82, 84 (Colo. App. 1976).  The Court of Appeals sought to harmonize § 19-

10-115, which prohibited disclosure of information in child abuse and neglect reports, and the

Public Meetings Law, which rendered public all meetings of state entities financed through

public funds.  *Id.*  The trial court addressed the supposed tension by ruling that the child

protection team was to hold its meetings publicly, but that it should go into executive session

(essentially a private meeting) to consider confidential information, records, or reports.  *Id.* at

84–85.  In reviewing the lower court's decision, Court of Appeals wrote

> The trial court drew a distinction between information which could lead to identification of the child, parents or informant, whether or not found in the reports, and information in the reports which is "nonconfidential."  We affirm the court's order prohibiting disclosure of any such "identifying information."
>
> However, it was erroneous to distinguish between confidential and nonconfidential material contained within the reports and records.  *The confidentiality provision of the Child Protection Act covers the Entire contents of a child abuse report and the records related thereto.*

*Id.* at 86 (emphasis added).

About eight months later, the legislature changed the language of § 19-10-115 to reflect language nearly identical to how the provision reads today.  The 1977 revision said "[e]xcept as provided in this section, reports of child abuse or neglect and the name and address of any child, family, or informant or any other identifying information contained in such reports shall be confidential and shall not be public information."  Children's Code, Colo. Sess. Laws 1977 (H.B. 77–1266).

In 1987 former § 19-10-115 was repealed and reenacted with the same language at § 19-3-314, as part of a recodification of the entire child abuse act.  Children's Code, Colo. Sess. Laws 1987 (S.B. 87–144).  The 1988 supplement to the Colorado Revised Statutes noted in the Annotator's Notes that "[s]ince § 19-3-314 is similar to § 19-10-115 as it existed prior to the 1987 repeal and reenactment of this title, relevant cases construing that provision have been included in the annotations to this section."  Colo. Rev. Stat. § 19-3-314 (Supp. 1988).  The notes reference two cases, *People v. Ross*, 745 P.2d 277 (Colo. App. 1987) and *People v. Dist. Court In & For City & Cty. of Denver*, 743 P.2d 432 (Colo. 1987), though not *Gillies*.  In 1990 the records confidentiality provision was again repealed and reenacted, with the same (1)(a-c) language, at § 19-1-120.  Colo. Rev. Stat. § 19-1-120 (1991).  In 1996 the provision was moved to its current location at § 19-1-307.  Children—Prevention Programs, Programmatic Review— Records and Information Act, 1996 Colo. Legis. Serv. H.B. 96-1017.

The Court concludes that § 19-1-307 prohibits disclosure of any information contained in child abuse or neglect reports or records.  The construction is supported by both the statute's text and decisions by Colorado courts interpreting it.  § 19-1-307(1)(a) makes confidential "reports of child abuse or neglect *and* the name and address of any child, family, or informant or any other

identifying information . . . ."  Per a plain reading of the statute, the separate reference to reports and the statute's use of 'and' suggest that the reports themselves are confidential, not just names, addresses, and other identifying information.

Reading the various criminal provisions of § 19-1-307 together leads to the same conclusion.  § 19-1-307(1)(c) penalizes disclosure of reports as well as of names, addresses, and identifying information as a class two petty offense with a three hundred dollar fine.  Meanwhile, § 19-1-307(4) penalizes disclosure of "data or information contained in the records and reports of child abuse or neglect" with a class one misdemeanor with six months' imprisonment or a five hundred dollar fine.  Subsection (4) is unambiguous—any information in the records or reports, not just identifying information such as names or addresses, is non-disclosable.  To read subsection (1)(c) statute narrowly as defendant McCann suggests, i.e. as prohibiting disclosure of only identifying information, would mean that (4) applies to a much broader range of information than (1)(c) but imposes a harsher set of penalties.  This means that someone who discloses nonidentifying information such as a child's being "elementary school-aged" could be subject to a misdemeanor conviction, while someone who discloses identifying information like a child's name—arguably much more harmful to the child—could be subject to only a petty offense conviction. This is an illogical result.  The most natural reading is that disclosure of *any* information, whether identifying or not, from reports or records is prohibited under § 19-1-307(1)(c) as well as § 19-1-307(4).

*Gillies* and another Colorado case further bolster this reading.  *Gillies* makes clear that the old version of the statute, § 19-10-115, covered the entire contents of reports, including both "confidential and non-confidential" information.  *Gillies*, 556 P.2d at 86.  Defendant Barnes

insists that *Gillies* is inapplicable here because it interpreted a "defunct" statute, not the language of § 19-1-307, writing that "Section 19-10-115's broad prohibition on disclosure far exceeds the targeted guardrails of § 19-1-307, which not only articulates the specific types of confidential information within child abuse and neglect records and reports, but also carves out dozens of exceptions to its prohibition on disclosure."  ECF No. 70 at 10.  I disagree.  Though the language differs slightly ("the contents of any record or report" from 1975 versus "reports of child abuse or neglect and the name and address of any child, family, or informant or any other identifying information contained in such reports"), there is nothing in the legislative history or case law to suggest that the Colorado Court of Appeals' interpretation of the 1975 language would not apply to the current language.  § 19-1-307 is a direct descendant of § 19-10-115.  The default confidentiality rule in each is substantively the same. A Colorado Supreme Court decision ten years later also supports this reading.  That decision referenced the revised § 19-10-115 language that is essentially identical to the current provision.  *Dist. Court In & For City & Cty. of Denver*, 743 P.2d at 436.  The court stated that "Section 19–10–115(1)(a) thus makes child abuse records confidential," implying that entire records (not just names, addresses, and other identifying information) are confidential and covered by the statute.

In sum, I conclude that § 19-1-307 prohibits disclosure, subject to certain exceptions, of records or reports of child abuse or neglect, and all contents therein, not just the identities of children, families, and informants.

> 2.  <u>Application of § 19-1-307 to Ms. Peck's prior and future statements</u>

The next preliminary question is whether the speech Ms. Peck engaged in and wishes to engage in is actually prohibited by § 19-1-307.  If it falls squarely outside the statute's

prohibitions, then, again, there is no controversy, and the Court's analysis ends.

In their joint stipulated facts, the parties narrow their consideration of Ms. Peck's past statements as compared to her complaint. They focus on her interview with Westword in January 2019 regarding John Affourtit, who was accused of murdering his girlfriend's son, and his ex-wife, whom Ms. Peck represented. Defendant McCann asserts that Ms. Peck "named the family members to the newspaper." ECF Nos. 65 at 6; 68 at 7. Identifying family members by name would place Ms. Peck within the confines of speech that she herself admits is legitimately prohibited from disclosure. Ms. Peck insists, however, that the article does not show that she disclosed identifying information. ECF No. 67 at 14. Instead, she points to her statements and disclosure of certain communications suggesting, both implicitly and explicitly, that Ms. Peck was critical of DHS' handling of her client's situation.

I agree with Ms. Peck here. Nowhere in the article does Ms. Peck give the name or address of her client or her client's children. ECF No. 24-2. Neither defendant points to any information in the article that could identify the client, her children, or the informant. Ms. Peck did nonetheless disclose nonidentifying information that is covered by § 19-1-307's prohibitions: a redacted email from a DHS caseworker which is part of the child abuse records, and a reference in the child abuse report to a specific phone call between Mr. Affourtit and her client that Ms. Peck believed did not occur. *Id.* at 5–6. She also made statements critical of DHS that were based on her observations of the investigation as detailed in the report. Plaintiff stated that "[i]t's stunning to [her] that DHS would file a case without a single shred of evidence," and asked whether "DHS [is] really going to be in the business of confiscating children" when "people stand up for family members." *Id.* at 3, 7. I therefore find that Ms. Peck's prior speech

falls within the ambit of disclosures prohibited by § 19-1-307.

As for her future speech, Ms. Peck says that she desires to make public statements, including through the press, that call out public officials and employees who issue materially false or improper reports about her clients. ECF No. 55 at ¶11. According to her, "[i]nformation relating to an inadequate agency response is meaningless without inclusion of a description of the facts calling for that response including any 'red flags' that may have been overlooked or ignored." ECF No. 73 at 8. In other words, without referencing specifics from child abuse or neglect reports, her public criticisms of officials will be less credible.

Whether § 19-1-307 prohibits this future speech is a closer question. There are ways for Ms. Peck to criticize child welfare workers that both do and do not violate the non-disclosure rules of § 19-1-307. For example, if she were to tell the press "Caseworker X has written false information in child abuse investigation reports involving four different clients of mine," it is hard to imagine how this statement would run afoul of the statute. Though presumably based on Ms. Peck's review of reports, it does not disclose any information actually contained in them. However, if Ms. Peck were to say to an interviewer, "Caseworker X lied in her investigation report when she stated that my client let her child fend for herself for dinner and frequently let her play outside unsupervised," this statement would contravene the statute's prohibitions because it references information directly contained in a child abuse record or report.[2]

Ms. Peck asserts that the latter is the type of speech she wants to engage in, and that the

---

[2] The reporting provision of the Children's Code reinforces this conclusion. According to that section, reports of suspected child abuse or neglect should include not only demographics of the child, alleged abuser, and informant, but also the "nature and extend of the child's injuries," "[a]ny action taken by the reporting source," and "[a]ny other information that the person making the report believes may be helpful" for investigation. COLO. REV. STAT. § 19-3-307. Reports will thus easily encompass the types of information—or misinformation—on which Ms. Peck did and seeks to base her criticisms.

statute chills because the "perceived lapses in judgment" by officials she wants to criticize are revealed by the records and reports themselves. ECF No. 69 at 12. The Court finds that her desire to cite information contained in these reports will also bring her future speech within the scope of § 19-1-307. The distance between the two hypothetical statements I mentioned above may at first glance appear slim. It is nonetheless wide enough to trigger the criminal penalties of § 19-1-307(1)(c) and (4) for utterance of the latter.

### B.  Standing

As in many free speech challenges to state action, the parties here debate standing vociferously. *See* ECF Nos. 65 at 6; 66 at 6; 69 at 3. A court may dismiss a case for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1). Standing is a question of subject matter jurisdiction, and thus a basis for 12(b)(1) dismissal. A plaintiff has constitutional standing when (1) she has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61. An "injury in fact" is an invasion of a legally protected interest that is concrete, particularized, and actual or imminent as opposed to conjectural or hypothetical. *Id.* There is no real debate here that the causation and redressability elements are met—if Ms. Peck were to be prosecuted for her speech it would be due to enforcement by defendants of § 19-1-307, and if the Court strikes down the provision as unconstitutional she would have no fear of contravening the law. Thus, I focus my analysis on whether plaintiff has suffered an injury in fact.

A classic case or controversy under Article III is a challenge to a statute that imposes criminal penalties for activity protected under the Constitution. *Diamond v. Charles*, 476 U.S.

54, 64 (1986).  When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'"  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  "But 'persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.'"  *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).  Put differently, mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).  When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court.  *Id.*

In challenges under the First Amendment, courts have recognized "two types of injuries [that] may confer Article III standing without necessitating . . . a criminal prosecution."  *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).  The first is when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder . . . ."  *Babbitt*, 442 U.S. at 298.  If a credible threat of prosecution exists, plaintiffs who have never been prosecuted or even threatened with prosecution in the past may still have standing.  *Doe v. Bolton*, 410 U.S. 179, 188 (1973).  The second is when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences."  *Ward*, 321 F.3d at 1267 (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003)).

These articulations are often intertwined.  For example, in *Walker* the Tenth Circuit "recognized that a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'"  *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).  A plaintiff suing for prospective relief "must demonstrate that expressive activities will be inhibited by 'an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement.'"  *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) (quoting *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006)).  Furthermore, while a past adverse effect supports standing, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Here, Ms. Peck was not prosecuted, threatened with prosecution, or even contacted by anyone in law enforcement or the District Attorney's office about her speech that violated § 19-1-307.  The Tenth Circuit's detailed standing analysis and three-part "objective chill" test in *Walker* is thus instructive:

> Line-drawing in standing cases is rarely easy, but where the plaintiff's alleged injury is a chilling effect on the freedom of speech, the standing inquiry is particularly delicate.  By definition, the injury is inchoate: because speech is chilled, it has not yet occurred and might never occur, yet the government may have taken no formal enforcement action.  We cannot ignore such harms just because there has been no need for the iron fist to slip its velvet glove.  On the other hand, in speech cases as in others, courts must not intervene in the processes of government in the absence of a sufficiently "concrete and particularized" injury.
>
> We hold that plaintiffs in a suit for prospective relief based on a "chilling effect" on

> speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Walker*, 450 F.3d at 1088–89.

Plaintiff passes this three-part "chilling effect" test. The Westword article constitutes evidence that she has engaged in speech prohibited by the statute. ECF No. 24-2. In her sworn declaration she states a present desire, though no specific plans, to use nonidentifying information from child abuse and neglect reports and records in violation of the statute to call out government employees. ECF No. 55 at ¶11. Finally, she has plausibly stated that she will not engage in such speech because she fears the statute will be enforced against her. *Id.* at ¶¶20, 22.

As defendants are quick to point out, however, *Walker* differs from this case because it involved a state constitutional provision about the number of votes needed to pass a citizen initiative, not a criminal statute or prosecution. *Walker*, 450 F.3d at 1088. The *Walker* court recognized that numerous cases arising from threat of criminal prosecution posed a serious question as to whether the law would be enforced against the plaintiff. *Id.* at 1090 (citing to *Winness*, 433 F.3d at 734; *D.L.S.*, 374 F.3d at 974–75; *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001); *Phelps v. Hamilton*, 122 F.3d 1309, 1327 (10th Cir. 1997)).

Yet, even focusing on credible threat of prosecution, plaintiff has alleged facts that pass standing muster. Defendants make much of Ms. Peck's not having been prosecuted, or even investigated, for her speech in the Westword article. But "the Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue."

*Wilson v. Stocker*, 819 F.2d 943, 946–47 (10th Cir. 1987).  Per my analysis above, the speech in which plaintiff seeks to engage is prohibited by the statute.  After her statements to Westword the judge in her client's case issued an order effectively warning her against violating the statute. While judicial officers have no authority to prosecute, such an order certainly constitutes "other consequences following from the statute's enforcement," as it subjected Ms. Peck to scrutiny in her court proceeding.  *Winsness*, 433 F.3d at 732.  All attorneys know that to ignore a direct order from a judge is unwise.  Ms. Peck could reasonably assume that continuing to violate § 19-1-307 would subject her to more severe repercussions, from sanctions to referral to a district attorney for prosecution.  Plaintiff points out that if a judicial officer were to complain to a district attorney about her violations, it is unlikely the officer would be ignored.  ECF No. 69 at 4.  I agree.

More importantly, plaintiff has shown a credible threat of prosecution because the state of Colorado has assured the federal government on an annual basis that it will enforce its child welfare laws—including § 19-1-307—in exchange for funding.  It is of course possible that defendants and their respective agencies are misrepresenting themselves to the federal government and have no intention of ever enforcing the statute's criminal penalties, even against willful, blatant, and repeated violators.  But I will not assume such dishonesty of government officials without an express disavowal of prosecution, which defendants have not provided.

Nor would such a disavowal be particularly convincing in this case.  Defendants have insisted that the criminal penalties of § 19-1-307(1)(c) and (4) are essential to its operation.  For example, Ms. Barnes writes that "[w]ere it not for the criminal sanctions, there would be no enforcement mechanism" to the confidentiality provision.  ECF No. 72 at 7.  She notes that the

criminal penalties have a long-lasting effect, like the negative impact of disclosure, and are thus necessary and commensurate.  ECF No. 66 at 19.  Ms. McCann concurs.  ECF No. 68 at 21–22.  Defendants cannot have it both ways.  They cannot insist that § 19-1-307's criminal penalties are required for upholding the provision's aims, and then deny that Ms. Peck would be prosecuted for violating the same.  The formal order directed at Ms. Peck by the state court judge constitutes a past adverse event, and the chilling of her speech through a credible fear of prosecution is a "continuing, present adverse effect[]."  *O'Shea*, 414 U.S. at 496.

Defendants urge this Court to find a lack of credible prosecution based on cases like *Winsness* and *Aptive*.  These comparisons do not convince the Court.  In *Winsness*, two individuals, Winsness and Larsen, brought suit alleging a Utah flag-desecration statute was unconstitutional.  A district attorney sought to dismiss the case on lack of standing because he himself doubted the constitutionality of the statute, and he stated in an affidavit that he had never filed and had no intention of filing criminal charges against the plaintiff for his flag desecration actions.  *Winsness*, 433 F.3d at 731.  The Tenth Circuit leaned heavily on the prosecutor's express, sworn disavowal from prosecution in finding that there was no threat of credible prosecution for either plaintiff, and thus that both plaintiffs lacked standing to sue.  *Id.* at 732–33.

With respect to Mr. Larsen the court noted that he had not been prosecuted, and that "[o]n the contrary, he has received assurances from the District Attorney that the flag-abuse statute will not be enforced against him or anyone else."  *Id.* at 733.  No such assurances have been provided to Ms. Peck here.  In fact, defendants have insisted that ability to prosecute under § 19-1-307 is essential to the statute, and the state has affirmed its commitment to enforcing the statute on a yearly basis.  As for Mr. Winsness, he had been prosecuted.  However, the court

found that he lacked standing because he had expressed no intent or desire to violate the flag-abuse statute in the future. *Id.* at 736. The same cannot be said for Ms. Peck, who has firmly stated her desire to speak in violation of § 19-1-307.

With respect to *Aptive*, that decision actually supports plaintiff's position here. There the Tenth Circuit held that a pest control company had standing to sue the City of Castle Rock for a city ordinance that placed a 7:00pm to 9:00am curfew on commercial door-to-door solicitation. *Aptive Envtl., LLC v. Town of Castle Rock, Colo.*, 959 F.3d 961, 975–77 (10th Cir. 2020). The court applied the three-part test from *Walker*, finding that (1) Aptive had in the past engaged in the type of speech affected by the challenged ordinance because it had solicited in Castle Rock after 7:00pm; (2) Aptive demonstrated a present desire to solicit after 7:00pm because that was when their sales did best; and (3) Aptive directed its sales reps to not work until dusk because of the threat of sanctions, and it ultimately stopped soliciting in Castle Rock at all. *Id.* Defendant Barnes attempts to distinguish *Aptive* by pointing to plaintiff's non-prosecution and a lack of evidence that § 19-1-307 had been enforced in the past. These are not absolute requisites for standing, however. In fact, the Tenth Circuit's holding in *Aptive* rested on similar grounds to those I find persuasive here: the city had not indicated it would not enforce the curfew if violated, and the city had "vigorously sought to uphold" the curfew in the litigation. *Id.* at 976.

Defendant Barnes also tries to distinguish *Aptive* by asserting that Ms. Peck's desire to speak in violation of § 19-1-307 is "speculative and conditional." ECF No. 66 at 10. She writes that "Ms. Peck's future desire to make statements prohibited by § 19-1-307(1)(a) depends not only on her learning information the statute protects from disclosure regarding a future, prospective client but her also unilaterally deeming the information to be 'materially false or

improper' . . . These conditions may never occur." *Id.* (citing ECF No. 55 at ¶11). Her argument recalls *Laird v. Tatum*, in which the Supreme Court found that plaintiffs lacked standing to enjoin the Army from collecting information about domestic political activities because their claim "piled speculation upon speculation: the Army might collect information about the plaintiffs, it might take some future action based on that information, and that action might injure the plaintiffs." *Laird*, 408 U.S. at 10–12. Ms. Peck's claim is substantially less speculative, however. It is guaranteed that she will come into possession of child abuse and neglect reports in the course of her work, and it is guaranteed that if she speaks to their content she will violate § 19-1-307. While it is not absolutely certain that state or county employees will comport themselves such that Ms. Peck will criticize them, it is probable. Plaintiff has pointed to two instances of such alleged conduct in the span of a few months, *see* ECF Nos. 24-2 and 24-3, and the state created child protection teams under § 19-3-308(6) expressly to address concerns of inadequate responses to child abuse and neglect.

I briefly address the overbreadth doctrine for standing because the parties dispute whether it applies. "Overbreadth is an exception to the prudential standing doctrine requiring plaintiffs to show that their own First Amendment rights (as opposed to the rights of third parties) have been violated . . . ." *Winsness*, 433 F.3d at 734. "A court should address an overbreadth challenge to a law only when the law may have a chilling effect on the free speech rights of parties not before the court." *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000). Because the Court has found that plaintiff sufficiently established the elements of standing for § 19-1-307 as to herself, prudential standing is not in question, and an overbreadth standing analysis is unnecessary. I thus turn to the merits of her claims.

**C.  First Amendment free speech**

Plaintiff raises two separate arguments in her first claim for relief.  She first challenges §

19-1-307 on the basis that it unduly restricts her political speech, i.e. her criticism of government

officials.  ECF No. 24 at ¶42–43.  The Court understands this to be an as-applied challenge

because it references the specific speech in which Ms. Peck engaged in the past and desires to

engage in the future.  Second, plaintiff contends that the statute is facially overbroad because it

violates the rights of others who speak on official misconduct by drawing on child abuse and

neglect reports.  *Id.* at ¶45.

All of the parties address both strict scrutiny and overbreadth in their briefs.  But none of

them is entirely clear on how these two doctrines fit together in analysis of First Amendment free

speech issues.  Some briefs seem to merge the two analyses, addressing overbreadth under

narrow tailoring, while others address them separately.  ECF Nos. 65 at 16; 66 at 13–20; 67 at

18–23.  I do not blame the parties for this somewhat jumbled outcome—the Supreme Court itself

has not provided clear guidance on when and how scrutiny tests versus overbreadth should

apply.  *E.g.*, *United States v. Stevens*, 559 U.S. 460, 474–80 (2010) (affirming on overbreadth

grounds a Third Circuit opinion which had analyzed a statute only under strict scrutiny); *Hill v.

Colorado*, 530 U.S. 703, 725–32 (2000) (analyzing statute separately under intermediate scrutiny

and then overbreadth); *Reno v. Am. C.L. Union*, 521 U.S. 844, 874–79 (1997) (blending

overbreadth language into strict scrutiny analysis of statute that sought to protect minors from

harmful material online).[3]

---

[3] A recent law review article addressed this very confusion.  Marc Rohr, *Parallel Doctrinal Bars: The
Unexplained Relationship Between Facial Overbreadth and "Scrutiny" Analysis in the Law of Freedom
of Speech*, 11 ELON L. REV. 95, 96 (2019).  The author concluded that no jurisprudence clarified when a

Given this confusion, I heed the highest Court's caution that the overbreadth doctrine is "not casually employed." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999). Plaintiff also pleads her as-applied challenge before her facial one. I therefore address plaintiff's challenge under strict scrutiny first, and I arrive at overbreadth as a last resort.

      1.   <u>Whether strict scrutiny applies</u>

The First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, unequivocally states that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment is the lifeblood of American democracy. *See, e.g.*, *First Unitarian Church of Los Angeles v. Cty. of Los Angeles*, 357 U.S. 513, 530 (1958) (Black, J., concurring) (stating that First Amendment freedoms "are absolutely indispensable for the preservation of a free society in which government is based upon the consent of an informed citizenry and is dedicated to the protection of the rights of all.").

Whenever a plaintiff challenges a speech restriction on First Amendment grounds, the court must determine at the outset whether the restriction is "content-based" or "content-neutral." A law regulating speech is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). When deciding whether a challenged law or ordinance is content-based, a court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* A content-based restriction is presumptively unconstitutional and subject to strict scrutiny. *Id.* Such a law must withstand strict scrutiny "regardless of the government's

---

scrutiny analysis should be used instead of overbreadth, or vice versa, and he noted different approaches both within the Supreme Court and across courts in different circuits. *Id.*

benign motive, content-neutral justification, or lack of 'animus toward the idea contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).  The test for whether a content-based law passes strict scrutiny is if it is "necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987).  The government bears the burden of showing that the law is the "least restrictive means" of achieving its compelling interest. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004).

The provision here is content-based.  The speech § 19-1-307 restricts is only records and reports of child abuse or neglect.  Its prohibition on disclosure thus applies based on the topic— whether the speech is contained in reports or records of child abuse—and not the "time, manner, or place" of the speech.

Defendant Barnes concedes that strict scrutiny applies.  ECF No. 66 at 12.  Defendant McCann, on the other hand, attempts to circumvent the application of strict scrutiny by arguing that plaintiff's speech does not qualify for First Amendment protection at all because it is not on a "matter of public concern."  ECF No. 65 at 11.  Whether speech is on a matter of public concern is one of the elements of the *Garcetti/Pickering* test, which determines if a public employee's speech warrants First Amendment protection.  *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  McCann contends that the test is "instructive" because plaintiff's speech concerns information she acquired as an attorney, and it is thus "work-related."  ECF No. 65 at 12.  I disagree.  The *Garcetti/Pickering* standard applies to speech by a public employee, full stop. Plaintiff here is a private attorney.  Defendant points to no authority, nor am I aware of any, that

extends this test to private individuals, i.e. to the speech of regular citizens, regardless of whether their speech is work-related.  In fact, every case to which defendant cites involves only public employees.  *Pickering*, 391 U.S. at 565 (public school teacher); *Garcetti*, 547 U.S. at 413 (deputy district attorney); *Butler v. Bd. of Cty. Commr's for San Miguel Cty.*, 920 F.3d 651, 653 (10th Cir. 2019) (supervisor for Road and Bridge Department); *Leverington v. City of Colo. Springs*, 643 F.3d 719, 722 (10th Cir. 2011) (nurse for internal staffing agency of city hospital enterprise).

The *Garcetti/Pickering* test exists because our judicial system recognizes the unique tension between free speech by public employees and the need for public employers to operate efficiently.  *See Butler*, 920 F.3d at 660–61.  To apply it here would collapse the speech rights of public employees into those of private citizens.  I will not do so.  Strict scrutiny applies here because § 19-1-307 is a content-based restriction.  I must therefore determine whether the government has shown both a compelling state interest and that § 19-1-307 is narrowly tailored.

2. Compelling state interest

Plaintiff does not dispute that there is a compelling state interest behind the § 19-1-307 confidentiality provision.  ECF Nos. 67 at 20; 69 at 10.  I too agree that defendants have met their burden under this part of the test.  That the federal government passed CAPTA with a requirement to protect against public disclosure of child abuse reports and records is strong evidence of the state's interest here.  The judiciary has also recognized this interest.  In a Supreme Court case reviewing a similar statute, the Court referred to "the Commonwealth's compelling interest in protecting its child-abuse information."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).  Additionally, the confidentiality of child abuse and neglect records is closely tied to the "state's generalized interests in investigating cases of alleged child abuse," which the

Tenth Circuit has called a "traditional and 'transcendent interest.'" *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993) (quoting *Maryland v. Craig*, 497 U.S. 836, 855 (1990)). Because the parties agree, I will not belabor the point. I find that defendants have proven a compelling state interest that justifies § 19-1-307.

      3.  Narrow tailoring

Having established a compelling state interest behind § 19-1-307, defendants must prove that the provision is narrowly tailored to that interest. "When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed. 'Content-based regulations are presumptively invalid.'" *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). When assessing whether a statute is narrowly tailored, "the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft*, 542 U.S. at 666. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816. However, "[t]he First Amendment requires that [a statute] be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)).

The Court concludes that § 19-1-307 is not narrowly tailored. Currently the statute criminalizes disclosure of any information contained within reports or records of child abuse or neglect, regardless of whether the information identifies individuals. There is a plausible, less-restrictive alternative available—narrowing the restricted speech to "identifying information"

from records and reports of child abuse and neglect.  While there is no question that protecting the confidentiality of children, families, and informants in the child welfare context is a compelling interest, the state has failed to prove that this alternative would be ineffective in achieving that goal.  The government's own stated purpose suggests the correct tailoring.  If the goal is protecting identities, then anything revealing or disclosing identities should be confidential.  Anything not revealing or disclosing identities, by contrast, should be disclosable.

A closer look at the distinction between identifying and nonidentifying information reveals how much speech § 19-1-307 improperly restricts.  For example, plaintiff might call out a caseworker for falsely stating in a report that a parent failed to pick his child up from school.  If that false accusation is unique to that child and parent, and thus identifying, the statute properly keeps it confidential.  If this behavior is common across multiple parents, however, it will not be identifying, and it thus sits in a "gray zone" of non-disclosable speech that in no way contributes to the statute's purpose.  Other illustrations of speech in this "gray zone" abound.  The steps an investigator took in response to a report, the time that elapsed between the report and the caseworker's actions, the conduct the caseworker observed in the home, and the statements that parents or children made can all be nonidentifying pieces of information from records or reports whose reference would violate the statute.  These examples demonstrate that the scope of nonidentifying non-disclosable speech is quite large.

Defendants insist that § 19-1-307 does not restrict more speech than necessary to balance the privacy interests of children, their families, and informants against the disclosure interests of those like Ms. Peck who wish to draw on reports or records to criticize the child welfare system.  But defendants' arguments rely largely on a misreading of the statute's scope.  For example, Ms.

Barnes writes in her motion that "[p]rohibiting disclosure of identifying information . . . is the least restrictive means of achieving the state's compelling interest in maintaining the confidentiality of those records." ECF No. 66 at 18. In fact, this is exactly plaintiff's position. Barnes then tries to recover in a subsequent brief by arguing that the entire contents of the reports are identifying, and thus should be confidential, "because each instance of abuse is characterized by its own unique circumstances." ECF No. 70 at 14. I disagreed with this contention in Section IV.A.1. Though each child's circumstances of abuse or neglect may be exceptional, the sum is not equal to its parts—the fact that each child abuse or neglect report may be unique, and thus identifying, does not mean that every piece of information contained within a report is identifying. Barnes' argument does nothing to show why nonidentifying data should be treated confidentially like identifying data. Meanwhile, defendant McCann responds to plaintiff's argument by relying on a reading of *Gillies* that I have also rejected. ECF No. 68 at 20. This too fails to prove why plaintiff's suggested alternative is not a less restrictive approach.

The government's own rules for child protection teams prove the viability of limiting non-disclosure to identifying information. After the *Gillies* decision in 1976, the Colorado legislature changed the scope of disclosure for child protection teams. The current statute provides that child protection teams "shall publicly review the responses of public and private agencies to each reported incident . . ., publicly state whether the responses were timely, adequate, and in compliance with the provisions of this part 3, and publicly report nonidentifying information relating to any inadequate responses . . . ." Colo. Rev. Stat. § 19-3-308(6)(f). While the *Gillies* court interpreted § 19-10-115 to preclude disclosure of *any* information contained in reports, i.e. both identifying and nonidentifying, today child protection teams may publicly

discuss nonidentifying information.  In fact, the statute expressly requires them to.  One of their core responsibilities is to review child abuse and neglect reports and determine how effectively the government responded to each report.  This task would be impossible without discussing the contents of the reports.

The sole response defendants have to this persuasive child protection teams argument is from Ms. Barnes.  She contends that "there is no reason the prohibition set forth in § 19-3-308, which applies to a unique subset of persons in conjunction with a unique set of obligations to disclose, should apply to other persons not similarly situated."  ECF No. 70 at 20.  Ms. Barnes misunderstands the applicable standard, however.  The question before the Court is not whether plaintiff is similarly situated to members of the child protection teams and thus should be granted the same disclosure permissions.  The question is whether defendants have proven that there is no less restrictive alternative to § 19-1-307's restriction on speech.  They have fallen short of meeting this burden.  That Ms. Peck and the child protection teams have different roles and responsibilities does nothing to explain why § 19-1-307's prohibition should not be limited to identifying information.  If nonidentifying information can be shared with the public by one set of actors, I see no reason to restrict disclosure of that same information, from the same exact sources, by other actors.

Finally, defendants urge me to conclude the statute is narrowly tailored because it does not completely restrict speech.  They point to the "good cause" exception that permits plaintiff to seek permission from a court to disclose otherwise confidential information.  They also note the myriad avenues through which plaintiff and others may report their concerns about government employees in child welfare.  ECF Nos. 65 at 20; 68 at 20–21; 70 at 15.  *See also* Colo. Rev. Stat.

§ 19-1-307(1)(b) and Section I.B, *supra*.  However, the availability of the "good cause"

exception does not render § 19-1-307 narrowly tailored.  Even if courts approved disclosure of

every nonidentifying piece of information in records or reports requested, the time, effort, and

access needed to seek such permission would de facto limit how much of that speech actually

occurs.  Such a restriction is simply not necessary.  A version of § 19-1-307 cabined to

identifying information achieves the same compelling state interest while restraining far less

speech.

As for the various government bodies to which plaintiff could voice her concerns, the

Court does not see how these bear on constitutionality.  Plaintiff rightly points out that

alternative channels for speech are relevant to intermediate scrutiny, not strict scrutiny.  *Reno*,

521 U.S. at 879 (rejecting argument that statute provided a "reasonable opportunity" to engage in

restricted speech as inapplicable to strict scrutiny analysis); *Ward v. Rock Against Racism*, 491

U.S. 781, 791 (1989) (noting that the government must "leave open ample alternative channels

for communication" in time, place, or manner regulations).  The fact that plaintiff may air

grievances to government actors does not explain why her public speech on nonidentifying child

abuse report information need be so restricted.  This argument is a red herring and does not

support defendants' position.

Content-based laws, like the one at issue here, are "presumptively invalid."  *Playboy*

*Entm't Grp.*, 529 U.S. at 817.  Defendants bear the burden of explaining why § 19-1-307's

restrictions are necessary to meet the compelling state interest of protecting confidentiality.

They have not done so.  I conclude that § 19-1-307 fails strict scrutiny due to its unnecessary

prohibition on disclosing nonidentifying information from records and reports of child abuse and

neglect.  The subsections criminalizing this non-disclosure, § 19-1-307(1)(c) and (4), are therefore unconstitutional.

**D.  Overbreadth**

Plaintiff also challenges § 19-1-307 as facially overbroad.  Overbreadth is "strong medicine," and courts "employ[] it with hesitation, and then, 'only as a last resort.'"  *West*, 206 F.3d at 1367 (quoting *United Reporting Publ'g*, 528 U.S. at 39).  Here, I have already deemed § 19-1-307 unconstitutional because it fails strict scrutiny.  I therefore find it unnecessary to address Ms. Peck's overbreadth challenge and decline to do so.

**E.  Vagueness**

Ms. Peck's final attack against the Children's Code's confidentiality provision is on vagueness grounds.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Restrictions on speech must not leave "uncertainty among speakers" about "just what they mean."  *Reno*, 521 U.S. at 871.  A court may find a statute impermissibly vague for two possible, independent reasons.  "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill*, 530 U.S. at 732.

Under the first reason, a vagueness challenge can be sustained where a statute's restraining of legitimate speech is "both real and substantial," and where the statute is not "readily subject to a narrowing construction by the state courts . . . ."  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60–61 (1976).  However, "speculation and 'hypertechnical theories as to what the statute covers' cannot create vagueness, especially when the statute is 'surely valid

in the vast majority of its intended applications.'" *Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192, 1202 (10th Cir. 2005) (quoting *Hill*, 530 U.S. at 733).  For the second reason, lack of notice, the Tenth Circuit has stated, "where a plaintiff knows the action in question violated the restriction, we have said that this 'state of mind is inconsistent with any claim that the policy did not give . . . fair warning . . . .'" *Id.* at 1202 (quoting *West*, 206 F.3d at 1368).  Such a restriction is not unconstitutionally vague. *Id.*

Ms. Peck advances three arguments for why § 19-1-307 is vague.  She first contends that the provision fails to provide notice or guidance on which of the two criminal sanctions—the petty offense under § 19-1-307(1)(c) or the misdemeanor under § 19-1-307(4)—will apply.  Second, she argues that the absence of any definition for "other identifying information" renders subsection § 19-1-307(1) impermissibly vague.  And third, she claims there is no way to "discern the parameters" of the death-of-a-child exception under § 19-1-307(1)(b) to the general non-disclosure rule.  ECF No. 67 at 24.  I address each argument separately.

1.  <u>Distinction between § 19-1-307's criminal penalties</u>

Subsection (1)(c) provides that "[a]ny person who violates any provision of this subsection (1) is guilty of a class 2 petty offense . . . ."  Subsection (4) provides that "[a]ny person who improperly releases or who willfully permits or encourages the release of [information in reports or records] commits a class 1 misdemeanor . . . ."  Colo. Rev. Stat. § 19-1-307.  Plaintiff argues that the confidentiality provision is impermissibly vague because there is no way of knowing which of these two subsections, and their corresponding criminal penalties, apply to which conduct.  For example, would Ms. Peck's statements to Westword subject her to prosecution under just (1)(c), or also to (4)'s harsher punishment?

Defendant McCann argues that the distinction between the two criminal provisions lies in their different culpability requirements.  § 19-1-307(1)(c) applies when there is less culpability, whereas the more serious misdemeanor provision requires willfulness or intentionality.  ECF No. 65 at 23–24.  Defendant Barnes concurs and explains it more clearly: because (1)(c)'s prohibition applies to "any violation," it is a strict liability crime that requires proof merely of prohibited nondisclosure.  Meanwhile, subsection (4) requires proof of "improper releases" or "willfully" permitting or encouraging, i.e. some level of scienter.  ECF No. 66 at 23.

I agree with defendants.  These are without doubt poorly written criminal subsections. But the language across the two subsections differs sufficiently for us to glean the legislature's meaning.  One encompasses virtually any violation of the non-disclosure rules, mentions no mental culpability, and imposes a lower penalty.  The other mentions mental culpability and imposes a higher penalty.  A reasonable person reading the statute would understand that if she disclosed inadvertently or without knowing, she would be subject to (1)(c), whereas if she violated the statute on purpose, she would be subject to (4) as well.

Plaintiff rejects the scienter argument, focusing heavily on the words "improperly releases" in (4).  She argues that the use of the "willful" scienter before the abetting provision, without a similar scienter before the "improperly releases" provision, suggests that the latter provision has no mens rea—i.e. it is a strict liability offense just like (1)(c).  To accept plaintiff's argument requires rejecting the most logical reading of the statute.  It makes more sense to presume the same scienter to all of subsection (4) than to align just part of it with strict liability in subsection (1)(c).  "Improperly" is not a recognized mens rea term, to be sure, but its straightforward meaning still implies some level of wrongdoing beyond an accidental or

inadvertent violation.  Furthermore, the Colorado Criminal Code states that "[w]hen a statute defining an offense prescribes as an element thereof a specified culpable mental state, that mental state is deemed to apply to every element of the offense unless an intent to limit its application clearly appears."  Colo. Rev. Stat. § 18-1-503.  Applying a similar principle makes sense here—if there are two ways to violate a single criminal provision and both have the same penalty, the scienter of one applies to the other unless otherwise stated.

Even if plaintiff's reading of the statute were logical, it would not prevail.  The Tenth Circuit recently reiterated that, "as between multiple reasonable interpretations of a statute, we will always prefer one that sustains constitutionality to one that does not under the presumption of constitutional validity.  *United States v. Brune*, 767 F.3d 1009, 1023 (10th Cir. 2014) (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937).  "In fact, 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Id.* at 1023–24 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012)).  Here, the criminal subsections of § 19-1-307 can be read together to avoid unconstitutionality.  That is thus the interpretation the Court adopts.

2.  Meaning of "other identifying information"

The confidentiality provision prohibits disclosure of "the name and address of any child, family, or informant or *any other identifying information* contained in such reports."  Colo. Rev. Stat. § 19-1-307 (emphasis added).  Plaintiff asserts that the statute is unconstitutionally vague because "other identifying information" is not defined.  The Court notes at the outset that this assertion significantly undermines the strict scrutiny position she takes.  But she is permitted to make arguments in the alternative, and I thus set this contradiction aside.  The crux of Ms. Peck's

contention under vagueness is that a Colorado Court of Appeals case suggests that the term must refer to directly identifying information, while defendants would apply it only to information that indirectly identifies a child.  ECF No. 67 at 24.

Plaintiff's attempt to distinguish between indirectly and directly identifying information is unavailing.  The Colorado case in question has no bearing on this issue.  In the context of a request for employment records, that court interpreted "personnel files" to include "home addresses, telephone numbers, financial information, and other information maintained because of the employer-employee relationship."  *Daniels v. City of Commerce City, Custodian of Records*, 988 P.2d 648, 651 (Colo. App. 1999).  It did not interpret the term "identifying information," nor did it distinguish between directly or indirectly identifying information.  *Id.* Nor is defendants' position that the term refers only to "indirectly" identifying information. Defendant Barnes argues defines the term as "facts and data, other than names and addresses, that may establish a person's identity."  ECF No. 70 at 23.

The Court agrees with Ms. Barnes' definition.  The interpretive doctrine *noscitur a sociis* ("a word is known by the company it keeps") tells us that "we are required to construe a phrase within a statute with reference to its accompanying words" as well as the statute's other provisions.  *Brune*, 767 F.3d at 1022–23.  The enumerated terms in § 19-1-307(1)(a) accompanying "other identifying information" are names and addresses, which identify the child, family member, or informant.  The statute also makes confidential other facts and data that reveal or establish identity.  It does so without reference to whether such identification is "direct" or "indirect."  Other identifying information could be a set of physical descriptors, which might be direct, or it might be a list of friends or colleagues, which is likely indirect.  As long as the

information is contained in a child abuse or neglect report and permits identification, it cannot be

disclosed.  The Court concludes that "other identifying information" is not void for vagueness.

Thus, to the extent that a rewriting of § 19-1-307 would restrict disclosure of only identifying

information—as suggested in Section IV.C—it would be constitutional.

    3.  <u>Parameters of §19-1-307(1)(b) exception</u>

The good cause exception regarding a child's death comprises the following language:

> Such disclosure shall not be prohibited when there is a death of a suspected victim of
> child abuse or neglect and the death becomes a matter of public record or the alleged
> juvenile offender is or was a victim of abuse or neglect or the suspected or alleged
> perpetrator becomes the subject of an arrest by a law enforcement agency or the subject
> of the filing of a formal charge by a law enforcement agency.

§ 19-1-307(1)(b).

Plaintiff argues that this subsection renders § 19-1-307 impermissibly vague because it

fails to specify when the exception applies.  She gives the example of Jamel Myles, a young boy

who tragically committed suicide in 2018.  ECF No. 24-1.  Under the exception, "the name and

address of the child and family and other identifying information involved in such reports" is

disclosable.  Ms. Peck references the hundreds of pages of reports about Jamel that also included

information about his two surviving sisters.  Is information about them disclosable, or would

such disclosure violate the statute?  What about a report that referenced only the surviving

siblings or family members but not the deceased child?  Plaintiff argues that these questions are

unanswerable given the statute's text.  ECF No. 69 at 16.

I disagree with plaintiff's reading.  Her argument creates ambiguity where there is none.

The non-disclosure exception for the death of a child is clear: that child's name and address, the

names and addresses of family members, including any surviving siblings, and any other

identifying information about the child and their family, are no longer confidential when the conditions of the exception are triggered.  Plaintiff poses the hypothetical of non-related families or children listed in the report.  Is that information also disclosable?  The provision answers "yes" if that information identifies the deceased child or his or her family; otherwise, "no."

Specific examples help clarify why this is the case.  In situations where there are other reports of child abuse that do not mention the deceased child, but instead identify only that child's family members, that information would still be disclosable under the exception.  The reason for that is straightforward—that information identifies one or more members of the deceased child's family, as contemplated by the statute.  A different situation arises where a non-family member, such as a friend or classmate, is mentioned in a report regarding a deceased child.  Information about those individuals, e.g. in reports alleging their own abuse or neglect, is *not* disclosable under the exception, except in the unlikely scenario where that information actually identifies the deceased child or family members.

This distinction makes sense.  The (1)(b) exception suggests greater scrutiny and information-sharing about a child and his or her family is warranted in the horrific event of the child's death.  The logic of that scrutiny and information-sharing does not, however, extend as readily to those who are outside the family and thus less likely to be involved in or have knowledge of the alleged abuse or neglect.  § 19-1-307(1)(b) appropriately balances protecting confidentiality in most circumstances with relaxing the non-disclosure rules in the most extreme ones.  There may of course be close cases where individuals privy to multiple reports mentioning multiple families need to look closely at what information identifies the deceased child and his or her family.  But that does not make the statute unconstitutionally vague.  No statute is

immediately one-hundred percent clear in all of its applications.  Because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."  *Grayned*, 408 U.S. at 110.  The Court concludes that § 19-1-307(1)(b) is not unconstitutional.

### ORDER

The Court holds that subsections of Colo. Rev. Stat. § 19-1-307(1)(c) and (4) are unconstitutional.  The Court therefore DENIES defendant McCann's motion for summary judgment [ECF No. 65] and defendant Barnes' motion for summary judgment [ECF No. 66].  The Court GRANTS plaintiff's motion for summary judgment [ECF No. 67].  The Court enjoins enforcement of § 19-1-307(1)(c) and (4).  As the prevailing party, plaintiff is awarded her reasonable costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 11th day of March, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge